**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION**

**LAFAGUS O. CARPENTER**                                                                      **PLAINTIFF**

**V.**                                                                                       **NO. 1:10CV136-SA-JAD**

**MISSISSIPPI VALLEY STATE UNIVERSITY;
CAPTAIN ISSAC MORRIS, In His Individual Capacity;
and CHIEF ROBERT SANDERS, In His Individual Capacity**                    **DEFENDANTS**

**MEMORANDUM OPINION**

Before the Court is Defendants' Motion to Dismiss or Alternatively For Summary Judgment [28], [30]. After reviewing the motions, responses, rules, and authorities, the Court finds as follows:

**BACKGROUND**

Plaintiff, LaFagus O. Carpenter, began working at Mississippi Valley State University ("MVSU") in December 2004, as a Patrolman. Plaintiff contends that he was subjected to continued retaliation and discrimination after the Defendants became aware that he planned to provide testimony in a former co-worker's Title VII lawsuit.[1] Plaintiff alleges that the Defendants questioned him about whether he would testify in his co-worker's action in December 2007, and again in August 2009. Plaintiff asserts that he endured a change in his shift hours and a demotion in November and December of 2009, after expressing his willingness to testify in the co-worker's suit. Plaintiff resigned from his employment at MVSU on January 28, 2010.

---

[1] Plaintiff's co-worker's lawsuit was filed in November 2006, and was ultimately dismissed due to settlement.

On May 18, 2010, Plaintiff filed a Complaint against MVSU and Captain Issac Morris ("Morris") and Chief Robert Sanders ("Sanders"), in their individual capacities, alleging: (1) discrimination, retaliation, hostile work environment, and constructive discharge under Title VII, 42 U.S.C. Section 2000e *et seq.*; (2) retaliation for exercising his First Amendment rights under 42 U.S.C. Section 1983; (3) a violation of the Equal Protection Clause of the Fourteenth Amendment under 42 U.S.C. Section 1983; and (4) a claim for punitive damages. Defendants have filed a Motion to Dismiss [28] and a Motion for Summary Judgment [30], arguing they are entitled to judgment as a matter of law as to all of Plaintiff's claims.[2]

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted under Rule 56(a) of the Federal Rules of Civil Procedure when evidence reveals no genuine dispute regarding any material fact and that the moving party is entitled to judgment as a matter of law. The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Id. at 323. The nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing

---

[2] While Defendants' first motion is styled as a "Motion to Dismiss," Defendants Memorandum in Support of the Motion to Dismiss discusses why the Defendants are allegedly entitled to summary judgment. Thus, for purposes of the Court's Memorandum Opinion, the Court treats both of Defendants' motions as one only for summary judgment.

that there is a genuine issue for trial.'" Id. at 324 (citation omitted). In reviewing the evidence, factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). When such contradictory facts exist, the Court may "not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000). However, conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments have never constituted an adequate substitute for specific facts showing a genuine issue for trial. TIG Ins. Co. v. Sedgwick James of Wash., 276 F.3d 754, 759 (5th Cir. 2002); SEC v. Recile, 10 F.3d 1093, 1097 (5th Cir. 1997); Little, 37 F.3d at 1075.

## ANALYSIS AND DISCUSSION

### Overview of the Immunity Defenses

A. Sovereign Immunity

MVSU argues that it is immune under the Eleventh Amendment from Plaintiff's claims. The Eleventh Amendment provides as follows:

> The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens of Subjects of a Foreign State.

U.S. CONST. amend. XI. This immunity is far reaching. It bars all suits, whether for injunctive, declaratory, or monetary relief, against the state and its departments, see Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 100-01, 104 S. Ct. 900, 908, 79 L. Ed. 2d 67 (1984), by citizens of another state, foreigners, or its own citizens, see Hans v. Louisiana,

134 U.S. 1, 10 S. Ct. 504, 33 L. Ed. 842 (1890).[3] A suit against a state agency "is a suit against the state" when that agency is an arm of the state. Daigle v. Gulf State Utilities Co., Local Union Number 2286, et al., 794 F.2d 974, 980 (5th Cir. 1986). Defendant MVSU asserts that it is immune from suit as it is an arm of the State of Mississippi.[4]

Numerous courts have consistently found state universities similar to MVSU to be considered arms of the State of Mississippi. See, e.g., Meredith v. Jackson State Univ., 2010 WL 606402, at *2 (S.D. Miss. Feb. 17, 2010) (noting that "[i]n both published and unpublished decisions, th[e] Court has consistently found [Jackson State University] to be an arm of the state") (citing Gentry v. Jackson State Univ., 610 F. Supp. 2d 564, 566 (S.D. Miss. 2009)); Chestang v. Alcorn State Univ., 2011 WL 1884728, at *4 (S.D. Miss. May 17, 2011) ("Alcorn State University is an arm of the State of Mississippi."). Further, the Fifth Circuit, in Whiting v. Jackson State University, considered the relevant "arm of the state" factors and concluded that "JSU is an agency of the state because it is a state-created political body, MISS. CODE ANN. § 37-125-1 (Cum. Supp. 1979), and receives state funding." 616 F.2d 116, 127 n.8 (5th Cir. 1980); (citing Henry v. Link, 408 F. Supp. 1204, 1207 (D.N.D. 1976), *mod. on other grounds*, 417 F. Supp. 360 (D.N.D. 1976)). Similarly, many other Fifth Circuit opinions hold that publicly funded state universities like MVSU are arms of the state. See Stotter v. Univ. of Tex. at San Antonio, 508 F.3d 812, 821 (5th Cir. 2007) ("This court has also recognized that state universities *as arms of the state* are not 'persons' under § 1983")

---

[3] The Eleventh Amendment likewise bars the adjudication of pendent state law claims against non-consenting state defendants in federal court. See generally Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 104 S. Ct. 900, 79 L. Ed. 2d 67 (1984).

[4] The Plaintiff never appears to challenge Defendant MVSU's assertion that it is an arm of the state.

(citations omitted) (emphasis added); <u>Richardson v. Southern Univ.</u>, 118 F.3d 450, 454-56 (5th Cir. 1997) ("Southern [University] and its Board are considered an agency of the State of Louisiana."). As such, the Court concludes that MVSU is indeed an arm of the State of Mississippi for purposes of this Court's Eleventh Amendment analysis.

Since the Court has determined that MVSU is an arm of the state, the Eleventh Amendment's immunity attaches to this action. A state's immunity from suit, however, is not absolute. <u>See</u>, <u>e.g.</u>, <u>Meyers v. Texas</u>, 410 F.3d 236, 241 (5th Cir. 2005). There are three "exceptions" to such immunity from suit: (1) the <u>Ex Parte Young</u> doctrine, which allows certain actions to be brought against an employee in his or her official capacity, (2) waiver, and (3) abrogation. The Court considers each of these in turn.[5]

*Ex Parte Young*

A suit against an employee in his or her official capacity is a suit against the entity of which the official is an agent. <u>Will v. Michigan Dep't of State Police</u>, 491 U.S. 58, 71, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989). However, an "exception" to immunity exists for suits seeking prospective injunctive relief against state employees in their official capacities. Under <u>Ex Parte Young</u>, 209 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908), the exception applies only if a suit alleging violations of federal law is "brought against individual persons in their official capacities as agents of the state, and the relief sought [is] declaratory or injunctive in nature and prospective in effect." <u>Aguilar v. Texas Dep't of Crim. Justice</u>, 160 F.3d 1052, 1054 (5th Cir. 1998). The case of <u>Ex Parte Young</u> involved a challenge to a

---

[5] While the Plaintiff does not specifically allege that any of these three specific exceptions apply, the Plaintiff does make a very convoluted argument asserting that MVSU is not entitled to immunity. As such, the Court considers the various ways in which MVSU's sovereign immunity could be "pierced," allowing suit to proceed against it.

Minnesota law reducing the freight rates that railroads could charge. A railroad shareholder claimed that the new rates were un-constitutionally confiscatory and obtained a federal injunction against Edward Young, the Attorney General of Minnesota, forbidding him in his official capacity to enforce the state law. When Young violated the injunction by initiating an enforcement action in state court, the circuit court held him in contempt and committed him to federal custody. In his habeas corpus application in the Supreme Court, Young challenged his confinement by arguing that Minnesota's sovereign immunity deprived the federal court of jurisdiction to enjoin him from performing his official duties. The Supreme Court disagreed and explained that because an unconstitutional legislative enactment is "void," a state official who enforces that law "comes into conflict with the superior authority of [the] Constitution," and therefore is "stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct. The State has no power to impart to him any immunity from responsibility to the supreme authority of the United States." Ex Parte Young, 209 U.S. at 159–160, 28 S. Ct. 441.

The logic of Ex Parte Young was motivated by a recognition of, and allegiance to, federal law as the supreme law of the United States. See Ex Parte Young, 209 U.S. at 167, 28 S. Ct. 441 (adopting "immunity stripping" rationale on the ground that "the state cannot . . . impart to the official immunity from responsibility of the supreme authority of the United States"). In other words, Ex Parte Young's logic is as follows: Young, in acting on behalf of the state, was accused of violating the United States Constitution; however, in ratifying the Constitution, states ceded power to the Supremacy Clause. As a consequence of that Clause, states are without authority to violate the Constitution and cannot, therefore, lawfully

authorize an agent to violate the Constitution either. Thus, where an individual -- acting in official capacity -- violates the Constitution, the official is thought to not be acting under "authority" of the state; therefore, that official's immunity is "stripped" for certain actions. See id.; see also Va. Office for Protection & Advocacy, – – – U.S. – – –, at – – –, 131 S. Ct. 1632, – – – L. Ed. 2d – – –, at – – –, 2011 WL 1466121, at *6 (2011)  ("[The Ex Parte Young doctrine] rests on the premise – less delicately called a 'fiction,' [ ] – that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes. The doctrine is limited to that precise situation, and does not apply when the state is the real, substantial party in interest.") (internal citations omitted); Idaho v. Coeur d'Alene Tribe, 521 U.S. 261, 293, 117 S. Ct. 2028, 138 L. Ed. 2d 438 (1997) ("Ex parte Young gives life to the Supremacy Clause."); Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 104, 105 S. Ct. 900, 79 L. Ed. 2d 67 (1984) ("[T]he Young doctrine has been accepted as necessary to permit the federal courts to vindicate federal rights and hold state officials responsible to the supreme authority of the United States.") (internal quotation marks omitted).

In this case, while Plaintiff is suing two state agents, Plaintiff is not suing either of these state employees in their "official" capacities. That is, Plaintiff's Complaint explicitly makes clear that he is suing both individuals "in [their] individual capacit[ies]" and for "individual liability."[6] Plaintiff never once even mentions official liability or capacity in his Complaint.  As noted above, an essential ingredient of the Ex Parte Young doctrine is that the state agent must be sued in his or her "official capacity." See, e.g., Ex Parte Young, 209 U.S.

---

[6] See Plaintiff's Complaint at 3.

at 159–160, 28 S. Ct. 441; see also Verizon Md., Inc. v. Public Serv. Comm'n of Md., 535 U.S. 635, 648, 122 S. Ct. 1753, 152 L. Ed. 2d 871 (2002) ("[T]he doctrine of Ex parte Young permits [plaintiff's] suit to go forward against the state commissioners i*n their official capacities*.") (emphasis added). However, despite this admonition in Ex Parte Young, confusion apparently still lingers concerning whether Ex Parte Young applies to state officers sued in their official capacities or in their individual capacities. As one district court has recently noted,

> There appears to be some uncertainty with regard to whether the exception carved out in Ex parte Young applies to state officers sued in their official capacities or in their individual capacities. See Verizon Md., Inc. v. Public Serv. Comm'n of Md., 535 U.S. 635, 648, 122 S. Ct. 1753, 152 L. Ed. 2d 871 (2002) ("[T]he doctrine of Ex parte Young permits [plaintiff's] suit to go forward against the state commissioners *in their official capacities.*") (emphasis added); Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 269, 117 S. Ct. 2028, 138 L. Ed. 2d 438 (1997) (acknowledging the exception carved out by Ex parte Young for "certain suits seeking declaratory and injunctive relief against state officers *in their individual capacities*") (emphasis added); Stroman Realty, Inc. v. Wercinski, 513 F.3d 476, 482 (5th Cir. 2008) ("Ex Parte Young subjects a state employee acting *in her official capacity* to suits for prospective relief that avoid the Eleventh Amendment bar.") (emphasis added); Melder v. Allstate Corp., 404 F.3d 328, 337 n.6 (5th Cir. 2005) (acknowledging the Ex parte Young exception for "suits for declaratory and injunctive relief against state officials *in their individual capacities*") (emphasis added). Indeed, in the very same paragraph where the Fifth Circuit in Saltz states that "[t]he essential ingredients of the Ex parte Young doctrine are that a suit must be brought against individual persons *in their official capacities* as agents of the state," it goes on to state that "the requirement for suing state officials *in their individual capacities* is an essential element of the Ex parte Young doctrine." Saltz, 976 F.2d at 968 (emphasis added).

Starr v. Cnty of El Paso, Tex., 2010 WL 3122797, at *3 n.3 (W.D. Tex. Aug. 5, 2010). The Court here sees no uncertainty in the Ex Parte Young doctrine, especially as it applies to this case. If a plaintiff is suing an officer only in his or her actual *individual* capacity -- as opposed to an individual in his or her *official* capacity -- then the suit would not be one

against the state at all; thus, there would be no need to carve out an exception such as Ex Parte Young from Eleventh Amendment jurisprudence. Instead, when such an official is sued in his or her individual capacity, he or she can raise the defense of *qualified* – as opposed to sovereign – immunity. See White v. Taylor, 959 F.2d 539, 544 (5th Cir. 1992). As the Fifth Circuit has more recently stated, "Under Ex Parte Young, a state official may be sued *in his official capacity* for injunctive relief without violating the Eleventh Amendment." Meza v. Livingston, 2010 WL 6511727, at *16 (5th Cir. Oct. 19, 2010) (emphasis added).[7]

---

[7] See also Vaqueria Tres Monjitas v. Irizarry, 587 F.3d 464, 577-78 (1st Cir. 2009) ("While a state may not be sued directly absent its own consent, the Ex Parte Young doctrine permits suits to proceed against state officers in their *official capacities* to compel them to comply with federal law.") (emphasis added); State Employees Bargaining Agent Coalition v. Rowland, 494 F.3d 71, 95 (2d Cir. 2007) ("Under . . . Ex Parte Young . . . a plaintiff may sue a state official acting in his official capacity-notwithstanding the Eleventh Amendment-for prospective, injunctive relief from violations of federal law.") (citations omitted); Banks v. Court of Common Pleas FJD, 342 F. App'x 818, 821 (3d Cir. 2009) ("[U]nder the Ex Parte Young, the Eleventh Amendment does not act as a bar . . . against state officials acting in their official capacities."); Franks v. Ross, 313 F.3d 184, 197 (4th Cir. 2002) (noting that the Ex Parte Young doctrine "allows private citizens, in proper cases, to petition a federal court to enjoin State officials in their official capacities . . . ."); Whitfield v. Tennessee, 639 F.3d 253, 257 (6th Cir. 2011) ("An Ex parte Young action may be commenced only against a state official acting in her official capacity . . . ."); Brown v. Budz, 398 F.3d 904, 917-18 (7th Cir. 2005) ("[U]nder the longstanding doctrine of Ex Parte Young, a private party can sue a state officer in his or her official capacity . . . .") (internal citations omitted); 281 Care Comm. v. Arneson, 638 F.3d 621, 632 (8th Cir. 2011) ("Under the Ex Parte Young doctrine, a private party can sue a state officer in his official capacity . . . ."); Pittman v. Oregon Employment Dep't, 509 F.3d 1065, 1071 (9th Cir. 2007) (citing to Ex Parte Young and noting that "[s]overeign immunity also does not bar suits for prospective injunctive relief against individual state officials acting in their official capacity"); Crowe & Dunlevy, P.C. v. Stidham, 2011 WL 2084203, at *12 (10th Cir. May 27, 2011) ("Under Ex Parte Young, certain official-capacity suits are excepted from the doctrine of sovereign immunity as a way to vindicate federal rights and, in the process, ensure the supremacy of federal law."); Grizzle v. Kemp, 634 F.3d 1314, 1319 (11th Cir. 2011) (citing to Ex Parte Young and explaining that "[a] state official is subject to suit in his official capacity when his office imbues him with the responsibility to enforce the law or laws at issue in the suit").

Additionally, this case is not one where there is uncertainty as to the capacity in which the individual Defendants are being sued. Plaintiff makes clear he is suing the officers only in their individual capacity, as Plaintiff's Complaint even concedes that "[]other acts of the individual defendants were *outside the purpose and scope of their employment* and are *individually liable* to those acts and conduct." See Plaintiff's Complaint at 2-3 (emphasis added). Thus, the Court concludes that the Ex Parte Young doctrine is inapplicable to this action.

*Waiver*

The second "exception" to sovereign immunity is waiver. A state can waive its Eleventh Amendment protection and allow a federal court to hear and decide a case commenced or prosecuted against it. Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 267, 117 S. Ct. 2028, 138 L. Ed. 2d 438 (1997). Waiver is present if the state voluntarily invokes federal-court jurisdiction or makes a clear declaration that it intends to submit itself to federal-court jurisdiction. See Meyers ex rel. Benzing v. Tex., 410 F.3d 236, 241 (5th Cir. 2005). The United States Supreme Court has held that a state may waive its common law sovereign immunity in state court without waiving its Eleventh Amendment immunity to state law claims brought in federal court. See College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 675-76, 119 S. Ct. 2219, 144 L. Ed. 2d 605 (1999); Port Authority Trans-Hudson Corp. v. Feeney, 495 U.S. 299, 306, 110 S. Ct. 1868, 109 L. Ed. 2d 264 (1990); Magnolia Venture Capital Corp. v. Prudential Securities, Inc., 151 F.3d 439, 443-44 (5th Cir. 1998). While Section 11-46-5 of the Mississippi Code does contain a general waiver of Mississippi's sovereign immunity, that waiver is limited to actions brought in the

state courts of Mississippi. See MISS. CODE ANN. § 11-46-5(4) ("Nothing contained in this chapter shall be construed to waive the immunity of the state from suit in federal courts guaranteed by the Eleventh Amendment to the Constitution of the United States."). As such, there is no evidence that the State of Mississippi has waived its immunity in this case.

*Abrogation*

Lastly, Congress can "abrogate" a state's Eleventh Amendment immunity without a state's consent. See Seminole Tribe v. Florida, 517 U.S. 44, 54, 116 S. Ct. 1114, 134 L. Ed. 2d 252 (1996). In Seminole Tribe, the Supreme Court set forth a two-part test for determining whether Congress has properly abrogated the states' Eleventh Amendment immunity. First, the court must determine whether Congress "unequivocally expresse[d] its intent to abrogate the immunity." Id. at 55, 116 S. Ct. 1114 (quotation omitted). This intent to abrogate must be expressed "in unmistakable language in the statute itself." Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 243, 105 S. Ct. 3142, 87 L. Ed. 2d 171 (1985). Second, the court must determine whether Congress acted "pursuant to a valid exercise of power." Seminole Tribe, 517 U.S. at 55, 116 S. Ct. 1114 (quotation omitted). In Seminole Tribe, the Court reaffirmed its previous holding that Congress can abrogate the states' Eleventh Amendment immunity when it enacts legislation pursuant to § 5 of the Fourteenth Amendment. See id. at 59, 116 S. Ct. 1114.

There are two different types of actions being asserted in this case: (1) claims under Section 1983, and (2) claims under Title VII. First, as the Fifth Circuit noted in Walker v. Livingston, "Section 1983 does not, explicitly or by its clear language, indicate on its face an intent to abrogate the immunity of the states." 381 F. App'x 477, 478 (5th Cir. 2010) (citing

Quern v. Jordan, 440 U.S. 332, 99 S. Ct. 1139, 59 L. Ed. 2d 358 (1979)); Jefferson v. Louisiana State Supreme Court, 46 F. App'x 732 (5th Cir. 2002) (per curiam) ("Although Congress may abrogate the states' sovereign immunity by enacting legislation, 42 U.S.C. § 1983 did not effect any such abrogation."); Aguilar v. Texas Dep't of Criminal Justice, 160 F.3d 1052, 1053 (5th Cir. 1998) ("The Eleventh Amendment bars claims against a state brought pursuant to 42 U.S.C. § 1983.").[8] Given this, Plaintiff's claims against Defendant MVSU under 1983 are dismissed pursuant to the Eleventh Amendment.[9]

However, Plaintiff's Title VII claims against MVSU fall on different footing than Plaintiff's Section 1983 claims. Title VII, which expressly authorizes suits against the states, abrogates Eleventh Amendment immunity because it was passed pursuant to Section Five of the Fourteenth Amendment. See Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 279, 117 S. Ct. 2028, 138 L. Ed. 2d 438 (1997) (citing Fitzpatrick v. Bitzer, 427 U.S. 445, 456-57, 96 S. Ct. 2666, 49 L. Ed. 2d 614 (1976)); Perez v. Region 20 Educ. Serv. Ctr., 307 F.3d 318, 326 n.1 (5th Cir. 2002) (finding that the Fifth Circuit has "long recognized that Congress has clearly abrogated the states' Eleventh Amendment immunity in enacting Title VII") (citing Ussery v. Louisiana ex rel. La. Dep't of Health & Hosps., 150 F.3d 431, 434-35 (5th Cir.

---

[8] Similarly, the Fifth Circuit has found that Congress has not abrogated the states' immunity for suits under Section 1981. See Hines v. Mississippi Dep't of Corrections, 239 F.3d 366 (5th Cir. 2000); Sessions v. Rusk State Hosp., 648 F.2d 1066, 1069 (5th Cir. 1981) ("Section 1981 contains no congressional waiver of the state's eleventh amendment immunity"); Dear v. Jackson State Univ., 2008 WL 4225766, at *4 (S.D. Miss. Sept. 10, 2008) (finding that JSU was entitled to immunity as to plaintiff's Section 1981 and Section 1983 claims).

[9] Additionally, the Court notes that "a plaintiff seeking damages against the State . . . cannot use § 1983 as a vehicle for redress because a State is not a 'person' under § 1983." Haywood v. Drown, --- U.S. ---, ---, 129 S. Ct. 2108, 2114 n.4, 173 L. Ed. 2d 920 (2009) (quoting Will v. Michigan Dep't of State Police, 491 U.S. 58, 66, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989)).

1998)).  Accordingly, MVSU is not entitled to Eleventh Amendment immunity on Plaintiff's Title VII claims.

B.  Qualified Immunity

Plaintiff brings various claims under Section 1983 against Morris and Sanders, individually.  A government employee may assert the affirmative defense of qualified immunity to a suit for a civil rights violation under Section 1983.  White, 959 F.2d at 544. Such immunity protects public officials from suit unless their conduct violates a clearly established constitutional right. Mace v. City of Palestine, 333 F.3d 621, 623 (5th Cir. 2003). The defendant must initially plead his good faith and establish that he was acting within the scope of his discretionary authority. Bazan v. Hidalgo Cnty, 246 F.3d 481, 489 (5th Cir. 2001). Once the defendant has done so, the burden shifts to the plaintiff to rebut this defense by establishing that the official's allegedly wrongful conduct violated clearly established law. Id.  A claim of qualified immunity requires the court to engage in a two-step analysis. The court determines whether the defendant has violated an actual constitutional right, see McClendon, 305 F.3d at 323, and if the answer is "no," the analysis ends. Freeman v. Gore, 483 F.3d 404, 410-11 (5th Cir. 2007). If the answer is "yes," then the court considers whether the defendant's actions were objectively unreasonable in light of clearly established law at the time of the conduct in question. Id. at 411. Prior to January 2009, this two-step process was a mandatory sequential analysis, meaning that courts were required to first analyze "step one" – the constitutional violation question – before moving to "step two." Saucier v. Katz, 533 U.S. 194, 200-01, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001), *overruled in part by* Pearson v. Callahan, 555 U.S. 223, ---, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009). The mandatory nature

of this sequential analysis was undermined in <u>Pearson v. Callahan</u>, in which the Court held that while courts may analyze qualified immunity by engaging in the <u>Saucier</u> "two-step" analysis described above, they are not required to do so and may skip the first question entirely and instead begin by determining whether the conduct was objectively reasonable under clearly established law. 129 S. Ct. at 818. This immunity defense gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law. <u>Mendenhall v. Riser</u>, 213 F.3d 226, 230 (5th Cir. 2000) (citations omitted).

Over the years, the doctrine of qualified immunity has endured considerable transformation. After the Supreme Court's recognition of a right of action for constitutional torts under <u>Bivens v. Six Unknown Fed. Narcotics Agents</u>, 403 U.S. 388, 397, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971), the Supreme Court began developing this defense of qualified immunity to protect federal employees against liability for, and the burden of defending themselves against, alleged violations of constitutional rights. As first formulated in <u>Butz v. Economou</u>, 438 U.S. 478, 495-98, 507, 98 S. Ct. 2894, 57 L. Ed. 2d 895 (1978), qualified immunity had both an objective and subjective element: the federal official was entitled to immunity if there were reasonable grounds to believe that the challenged conduct did not violate a constitutional right (the objective element) and the official undertook the challenged conduct in a good-faith belief that the conduct was valid (the subjective element). However, on further consideration, the Court in <u>Harlow v. Fitzgerald</u> stated, "[t]he subjective element of the good-faith defense frequently has proved incompatible with our admonition in <u>Butz</u> that insubstantial claims should not proceed to trial." 457 U.S. 800, 815-16, 102 S. Ct. 2727, 73 L.

Ed. 2d 396 (1982). Therefore, the modern qualified immunity doctrine is viewed only through the lens of objective reasonableness. Id., at 815-16, 102 S. Ct. 2727.[10]

***Title VII Claims***

Plaintiff appears to bring his Title VII claims against *both* the individual Defendants – in their individual capacities – as well as MVSU. Before turning to the merits of Plaintiff's Title VII allegations, the Court first discusses whether Plaintiff's Title VII claims may proceed against both parties.

A. Title VII Claims Against the Individual Defendants

Plaintiff seeks to impose individual liability under Title VII against both Morris and Sanders. While Title VII defines "employer" to include any agent of the employer, the Fifth Circuit does not interpret the statute to impose individual liability on the agent. See Indest v. Freeman Decorating, Inc., 164 F.3d 258, 262 (5th Cir. 1999); Chehl v. Southern Univ. and Agric. And Mech. Coll., 34 F. App'x 963 (5th Cir. 2002) ("Title VII does not impose personal liability on individuals."); Grant v. Lone Star Co., 21 F.3d 649 (5th Cir. 1994) (holding that "[o]nly 'employers,' not individuals acting in their individual capacity who do not otherwise meet the definition of 'employers,' can be held liable under Title VII"); Clanton v. Orleans Parish Sch. Bd., 649 F.2d 1084 (5th Cir. 1981) (holding that a supervisor who implemented a maternity leave policy that violated the terms of Title VII could not be held individually

---

[10] Although the modern qualified immunity doctrine concerns itself with objective reasonableness, the Supreme Court made clear in Crawford-El v. Britton that Harlow does not prohibit inquiry into a defendant's subjective intent when it pertains to an essential element of the alleged constitutional violation. 523 U.S. 574, 588-89, 118 S. Ct. 1584, 140 L. Ed. 2d 759 (1998). Crawford-El was a First Amendment retaliation case where the defendant's intent was element of the claim. Id. As such, subjective intent could very well be relevant in this case under Plaintiff's First Amendment retaliation claim.

liable); <u>Chavez v. McDonald's Corp.</u>, 1999 WL 814527, at *2 (N.D. Tex. Oct. 8, 1999) (dismissing Title VII claim brought against supervisor in his individual capacity). "[R]elief under Title VII is available only against an employer, not an individual supervisor or fellow employee." <u>Foley v. Univ. of Houston Sys.</u>, 355 F.3d 333, 340 (5th Cir. 2003); <u>Ackel v. Nat'l Commc'ns, Inc.</u>, 339 F.3d 376, 381 (5th Cir. 2003) ("Individuals are not liable under Title VII in either their individual or official capacities."). Accordingly, the Court concludes that Plaintiff's Title VII claims may not proceed against the individual Defendants, as Title VII liability does not attach to individuals acting in their individual capacity.

Additionally, a Plaintiff may not maintain a Title VII action against both the actual employer and the employer's agent. Generally, only "employers" may be liable under Title VII. <u>Turner v. Baylor Richardson Med. Ctr</u>, 476 F.3d 337, 343 (5th Cir. 2007) (citations omitted). To qualify as an employer under Title VII, two conditions must be met: (1) the defendant must fall within the statutory definition; and (2) there must be an employment relationship between the plaintiff and the defendant. <u>Deal v. State Farm County Mut. Ins. Co. of Texas</u>, 5 F.3d 117, 118 n.2 (5th Cir. 1993) (citation omitted).

Title VII defines an "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees . . ., *and any agent of such a person* . . ." <u>See</u> 42 U.S.C. § 2000e(b)) (emphasis added).[11] While the "any agent" language is construed "liberally," <u>see</u> <u>Harvey v. Blake</u>, 913 F.2d 226, 227 (5th Cir. 1990), it is not interpreted literally. Rather, the phrase conveys Congress's intent to "import *respondeat superior*

---

[11] A "person," in turn, "includes one or more individuals, governments, governmental agencies, political subdivisions, labor unions, partnerships, associations, corporations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations, trustees, trustees in cases under Title 11, or receivers." 42 U.S.C. § 2000e(a).

liability into Title VII." Smith v. Amedisys, Inc., 298 F.3d 434, 449 (5th Cir. 2002) (citations omitted). Although, while under certain circumstances — for example, when the supervisor has been delegated the employer's traditional rights such as hiring and firing — an immediate supervisor may be considered an "agent" and therefore an "employer" under Title VII, the supervisor faces liability solely in her *official*, not individual, capacity. Harvey, 913 F.2d at 227; Grant v. Lone Star Co., 21 F.3d 649, 652–53 (5th Cir. 1994). Thus, a Title VII suit against a supervisor, who is not an "employer" in his or her own right — is actually a suit against the employing corporation. Indest v. Freeman Decorating, Inc., 164, F.3d 258, 262 (5th Cir. 1999). A plaintiff, however, may not maintain a Title VII action against both her employer and the employer's agent because the employer could then face double liability for the same act. Id. (citation omitted). In other words, joinder of both the employer and its agent is redundant.

Here, there are no facts in the record to demonstrate that the individual Defendants could satisfy Title VII's statutory definition of "employer." See 42 U.S.C. § 2000e(b). For example, the record is void of evidence that the individual Defendants each employed 15 or more employees. Id. Thus, even if this was an official-capacity suit against Morris and Sanders, these individuals would be characterized as agents of MVSU and, having named MVSU as a Defendant, the joinder of these two individuals in their official capacity would be impermissibly redundant. See Indest, 164 F.3d at 262 ("[A] plaintiff does not have an action against both the corporation and its officer in an official capacity.").

B.  Title VII Claims Against MVSU

Plaintiff appears to bring four separate claims against the State Defendant under Title VII: (1) discrimination, (2) retaliation, (3) harassment/hostile work environment, and (4) constructive discharge.[12]

*Discrimination*

Under Title VII, it is "an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  In his Complaint, Plaintiff generally alleges he was discriminated against.  Plaintiff apparently seeks to prove his case circumstantially; thus, the Court turns to the standards set forth by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

Under the McDonnell Douglas standard, Plaintiff must first establish a prima facie case of discrimination by establishing that he was (1) a member of a protected group; (2) qualified for the position she held; (3) that she suffered an adverse employment decision; and (4) either replaced by someone outside the protected group or treated less favorably than employees not in the protected group. Okoye v. Univ. of Tex. Houston Health Sci. Ctr., 245 F.3d 507, 513 (5th Cir. 2001).  Proof of disparate treatment can establish the fourth element of

---

[12] While all four of these claims are, at some point, referenced in Plaintiff's Complaint, Plaintiff's summary judgment brief appears to make clear that he is only actually alleging claims for retaliation and constructive discharge. However, because Plaintiff's brief is not entirely clear, the Court addresses all four actions.

the plaintiff's prima facie case. See Bryant v. Compass Group USA Inc., 413 F.3d 471, 478 (5th Cir. 2005).

Once a plaintiff has made her prima facie case, the defendant then has the burden of producing a legitimate, nondiscriminatory motive for the adverse employment action. Parker v. State of La. Dep't of Educ. Special Sch. Dist., 323 F. App'x 321, 327 (5th Cir. 2009). The defendant's burden at this stage is merely one of production-not persuasion. Id.

If the defendant can articulate a reason that, if believed, would support a finding that the action was nondiscriminatory, then the inference of discrimination created by the plaintiff's prima facie case disappears, and the factfinder must decide the ultimate question of whether the plaintiff has proven intentional discrimination. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511-12, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993). The plaintiff must present substantial evidence that the employer's proffered reason is a pretext for discrimination. Laxton v. Gap, Inc., 333 F.3d 572, 578 (5th Cir. 2003). To show pretext on summary judgment, "the plaintiff must substantiate his claim of pretext through evidence demonstrating that discrimination lay at the heart of the employer's decision." Price v. Fed. Express Corp., 283 F.3d 715, 720 (5th Cir. 2002).

Pretext may be established "either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or 'unworthy of credence.'" Laxton, 333 F.3d at 578 (quoting Reeves, 530 U.S. at 143, 120 S. Ct. 2097). "To raise an inference of discrimination, the plaintiff may compare his treatment to that of nearly identical, similarly situated individuals." Bryant v. Compass Group USA Inc., 413 F.3d 471, 478 (5th Cir. 2005). To establish disparate treatment, however, a plaintiff must show that the employer

gave preferential treatment to another employee under "nearly identical" circumstances." Id. Alternatively, "[a]n explanation is false or unworthy of credence if it is not the real reason for the adverse employment action." Laxton, 333 F.3d at 578.

In contrast, the Fifth Circuit has modified the McDonnell Douglas formulation to permit proof that discrimination was one motivating factor among others for an adverse employment action. See generally Rachid v. Jack in the Box, Inc., 376 F.3d 305 (5th Cir. 2004). At one time, the Fifth Circuit required that a plaintiff present direct evidence of discrimination in order to receive the benefit of a mixed-motive analysis. See Fierros v. Tex. Dep't of Health, 274 F.3d 187, 191 (5th Cir. 2001). However, the Supreme Court in Desert Palace, Inc. v. Costa held that Congress's failure to require a heightened burden of proof suggested that courts should not depart from the general rule of civil litigation that "requires a plaintiff to prove his case 'by a preponderance of the evidence,' using 'direct or circumstantial evidence.'" 539 U.S. 90, 99, 123 S. Ct. 2148, 156 L. Ed. 2d 84 (2003) (quoting Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 714 n. 3, 103 S. Ct. 1478, 75 L. Ed. 2d 403 (1983)). Therefore, a plaintiff asserting a Title VII discrimination claim may utilize the mixed-motive analysis whether she has presented direct or circumstantial evidence of discrimination. Id. at 101, 123 S. Ct. 2148; Smith v. Xerox Corp., 602 F.3d 320, 327-28 (5th Cir. 2010).

Plaintiff has failed to prove a prima facie case of discrimination. In fact, Plaintiff failed to discuss his discrimination claim in his Response in Opposition to Summary

Judgment.[13]  Further, Plaintiff did not mention in his Complaint what "type" of discrimination he is alleging, or what protected class he belongs to. That is, Plaintiff never states whether he is alleging racial discrimination, gender discrimination, or some other form of discrimination. Accordingly, because Plaintiff failed to set forth any facts demonstrating discriminatory animus, the Motion for Summary Judgment is granted as to this claim.

*Retaliation*

Plaintiff next alleges that he was retaliated against in violation of Title VII.  A plaintiff establishes a prima facie case of retaliation by showing that: (1) he engaged in an activity protected by Title VII; (2) he was subjected to an adverse employment action; (3) a causal link exists between the protected activity and the adverse employment action. See Stewart v. Mississippi Transp. Comm'n, 586 F.3d 321, 331 (5th Cir. 2009).  If the plaintiff makes out a prima facie case of retaliation, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the employment action. Aryain v. Wal-Mart Stores Tex. LP, 534 F.3d 473, 484 (5th Cir. 2008). If the employer satisfies its burden of production, the plaintiff must prove that the employer's proffered legitimate, non-retaliatory reason is pretext for a retaliatory purpose. Id.  In doing so, the plaintiff must prove that "the adverse employment action taken against [her] would not have occurred 'but for' her protected conduct." Septimus v. Univ. of Houston, 399 F.3d 601, 608 (5th Cir. 2005); see also Long v. Eastfield Coll., 88 F.3d 300, 304 n.4 (5th Cir. 1996) ("ultimate determination in an unlawful retaliation case is whether the conduct protected by Title VII was a 'but for' cause of the adverse employment

---

[13] To be clear, Plaintiff does mention the word "discrimination" in his brief. However, he mentions discrimination while discussing his retaliation claim. He appears to be saying he was discriminated against by retaliatory conduct.

decision") (citing <u>McDaniel v. Temple Indep. Sch. Dist.</u>, 770 F.2d 1340, 1346 (5th Cir. 1985)).

However, recently, the Fifth Circuit applied the reasoning of <u>Desert Palace</u> to Title VII retaliation claims, thus providing plaintiffs with another avenue, other than just pretext, to prove retaliation. <u>See</u> <u>Smith</u>, 602 F.3d at 332. Accordingly, a Title VII plaintiff – whether asserting discrimination or retaliation claims – may now rebut a defendant's legitimate, nondiscriminatory reason for an adverse employment action by proving that "(1) the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative), or (2) the defendant's reason, though true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic (mixed-motives alternative)." <u>Davis v. Farmers Ins. Exch.</u>, 2010 U.S. App. LEXIS 7130, at *5 (5th Cir. Apr. 6, 2010).

**(i)      Prima Facie Case**

The first step in establishing a prima facie case is demonstrating the existence of protected activity under Title VII. Here, Plaintiff appears to be alleging that he engaged in two different activities protected by Title VII. First, Plaintiff contends that "[P]laintiff's termination, which he also alleges was retaliatory, occurred shortly after his filing of the EEO charges in December 2005 and February 2006."[14] Second, Plaintiff asserts that he was questioned in December 2007, and again in August 2009, about whether or not he planned on testifying in a former co-worker's employment discrimination lawsuit. Plaintiff asserts that when he was asked about testifying, he stated on both occasions that he would "tell the truth

_____

[14] <u>See</u> Plaintiff's Brief at 10.

as [he] knew it to be." The Court considers each of these alleged protected activities separately.

First, the Court turns to Plaintiff's argument concerning his EEOC charge. In Plaintiff's brief, he asserts that he filed EEOC charges in December 2005 and February 2006, and that he was "terminat[ed]" due to such charges. The Court is entirely perplexed by this argument. The EEOC "Charge of Discrimination" attached to Plaintiff's Complaint is dated February 8, 2010. There is no mention anywhere in the record of any other EEOC charges being filed or any alleged retaliatory conduct dating back to 2005 and 2006. Plaintiff was also not "terminated" in this case; he resigned. Plaintiff tendered his "Letter of Resignation" on January 28, 2010, and as noted, he did not file a charge with the EEOC until February 8, 2010. Given that Plaintiff filed his EEOC charge *after* he tendered his resignation, the act of filing this charge could not be a "factor" in the alleged retaliation.

Second, Plaintiff asserts that his willingness to testify in a former co-worker's lawsuit constitutes protected activity. Plaintiff never actually testified in the lawsuit; however, he states that telling his supervisors that he "would tell the truth" if called to testify suffices under Title VII's definition of protected activity. Plaintiff further asserts that he was listed as a witness in the trial and that he "provided information" to EEOC investigators.

Section 704(a) of Title VII provides protection for two distinct classes of employees: first, those opposing discrimination proscribed by the statute and second, those participating in Title VII proceedings. To be specific, the so-called anti-retaliation clause of Section 704(a) reads, in pertinent part:

> It shall be an unlawful employment practice for an employer to discriminate against any of [its] employees . . . because he has opposed any practice made

an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated *in any manner* in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a) (emphasis added). Here, the Court concludes that Plaintiff's willingness to testify in a former co-worker's employment discrimination lawsuit suffices as protected activity under the participation clause of Title VII's anti-retaliation provision.[15]

In construing a statute such as Section 704(a) of Title VII, courts begin with the language and text of the statute itself. See Robinson v. Shell Oil Co., 519 U.S. 337, 340 , 117 S. Ct. 843, 136 L. Ed. 2d 808 (1997); Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-54, 112 S. Ct. 1146, 117 L. Ed. 2d 391 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what is says there."). The anti-retaliation provision explicitly states that it protects an individual who has "participated *in any manner*" in a Title VII proceeding. 42 U.S.C. § 2000e-3(a) (emphasis added). Courts appear to consistently read this clause as evincing Congress's intent to confer broad protection under the statute. See Pettway v. Am. Cast Iron Pipe Co., 411 F.2d 998, 1006 n.18 (5th Cir. 1969) (noting that the participation clause provides "exceptionally broad" protection"); Kelly v. City of Albuquerque, 542 F.3d 802, 814 (10th Cir. 2008) ("The term 'any' carries an expansive meaning when . . . it is used without limitation . . . When the term

---

[15] While the Defendants cite to both clauses of Title VII's anti-retaliation provision (i.e., the participation and opposition clauses), they only actually discuss the opposition clause. That is, Defendants fail to discuss whether Plaintiff has engaged in protected activity under the *participation* clause of 42 U.S.C. Section 2000e-3(a). A claim that "is best understood as falling under [the] participation clause . . . should not be analyzed solely under the narrower opposition clause." Deravin v. Kerik, 335 F.3d 195, 203 n.6 (2d Cir. 2003). Further, while Defendants blanketly assert that Plaintiff did not engage in protected activity, Defendants fail to analyze, or even mention, whether the willingness to testify, being listed as a witness, and providing information to the EEOC constitutes such protected activity under Title VII.

is given its natural effect in this statutory context it relates to all types of participation."); <u>Jute v. Hamilton Sunstrand Corp.</u>, 420 F.3d 166, 175 (2d Cir. 2005) ("Congress chose to provide wide-ranging protection by shielding an employee who 'participate[s] in any manner' in a Title VII proceeding.") (brackets in original); <u>Deravin v. Kerik</u>, 335 F.3d 195, 203 (2d Cir. 2003) (noting that the participation clauses "explicit language . . . is expansive"); <u>Booker v. Brown & Williamson Tobacco Co.</u>, 879 F.2d 1304, 1312 (6th Cir. 1989) (stating that "federal courts have generally granted less protection for opposition than for participation" and that the participation clause offers exceptionally broad protection"); <u>Learned v. City of Bellevue</u>, 860 F.2d 928, 932 (9th Cir. 1988) ("The participation clause is broadly construed to protect employees who utilize the tools provided by Congress to protect their rights.").

Additional support for an expansive reading of the participation clause can also be found by examining the broader context of the statute as a whole. The anti-retaliation provision is meant to prevent harm to employees who report discriminatory employment practices or assist in the investigation of these practices. <u>Crawford v. Metro. Gov't of Nashville and Davidson County, Tenn.</u>, --- U.S. ----, ----, 129 S. Ct. 846, 852, 172 L. Ed. 2d 650 (2009). The Supreme Court in <u>Crawford</u> held that "prudent employees would have a good reason to keep quiet about Title VII offenses against themselves or against others" if an employer could punish employees who reported discrimination without remedy. <u>Id.</u> The purpose of the anti-retaliation clause is to "[maintain] unfettered access to statutory remedial mechanisms." <u>Robinson v. Shell Oil Co.</u>, 519 U.S. 337, 346 117 S. Ct. 843, 136 L. Ed. 2d 808 (1997); <u>Glover v. S.C. Law Enforcement Div.</u>, 170 F.3d 411, 414 (4th Cir. 1999) ("Section 704(a)'s protections ensure not only that employers cannot intimidate their employees into

foregoing the Title VII grievance process, but also that investigators will have access to the unchilled testimony of witnesses."); Booker, 879 F.2d at 1313 ("The purpose of the statute is to protect access to the machinery available to seek redress for civil rights violations and to protect the operation of that machinery once it has been engaged.").

In Jute v. Hamilton Sunstrand Corporation, the Second Circuit considered the anti-retaliation provision's broader context in order to ensure that the seemingly expansive language was consistent with Title VII's overall purpose. 420 F.3d at 174-75. The plaintiff in Jute, Donna S. Jute, alleged that she was retaliated against after she was named as a witness in a co-worker's Title VII suit. Id. at 169. Although Jute never actually testified, the Second Circuit held that she was protected under the anti-retaliation clause. The court noted that,

> It would be destructive of [the anti-relation clause's] purpose to leave an employee who is poised to support a co-worker's discrimination claim wholly unprotected. Accepting [the Defendant's] argument would mean, for example, that an employer could freely retaliate against a Title VII whistleblower, as long as it did so before the employee actually testified. Placing a voluntary witness into this kind of limbo would impede remedial mechanisms by denying interested parties "access to the unchilled testimony of witnesses." Glover v. South Carolina Law Enforcement Div., 170 F.3d 411, 414 (4th Cir. 1999). Thus, declining to extend § 704(a) to an employee like Jute would thwart the congressional intent underlying the anti-retaliation clause.

Id. at 175. Thus, after an examination of the Title VII's language and overall purpose, the court held that the participation clause extends to an employee who is named as a voluntary witness in a Title VII suit, but who never is called to testify. Id. at 175; Hendershot v. Home Depot, Inc., 2009 WL 367543, at *3 (E.D. Pa. Feb. 13, 2009) (denying summary judgment and finding that plaintiff's actions fell under the participation clause of the anti-retaliation provision when plaintiff stated that he would "tell the truth" in an EEOC hearing); Weston v.

Optima Communications Sys., Inc., 2009 WL 3200653, at *5 (S.D.N.Y. Oct. 7, 2009) (finding that employee engaged in protected activity when she stated that she would "tell the truth" in her co-worker's lawsuit); Tucker v. Journal Register East, 520 F. Supp. 2d 374, 382-84 (D. Conn. 2007) (holding that plaintiff's conduct was sufficient to qualify as a "protected activity" when she refused to testify as a favorable witness for her employer in a sexual harassment claim); see also Dubaz v. Johnson Controls World Servs., 163 F.3d 1357, 1998 WL 858836, at *2 (5th Cir. Nov. 20, 1998) (finding that the plaintiff engaged in protected activity when she offered depositions testimony in a lawsuit).

This Court finds the Second Circuit's reasoning in Jute to be applicable here. Plaintiff was questioned about his co-worker's Title VII case on two separate occasions. While, like in Jute, Plaintiff never actually testified because the lawsuit settled, Plaintiff asserted his willingness to testify and to "tell the truth" on two separate occasions in direct response to questions from his supervisors. Further, also like Jute, Plaintiff asserts that he had been listed as a witness and that he had provided information to the EEOC. Without protection under Title VII for such actions, employees could easily be intimidated into not testifying or not supporting a co-worker's discrimination claim, causing Title VII prosecutions and EEOC investigations to be chilled due to fear of retaliation by employers. This would in turn thwart the congressional intent underlying the anti-retaliation clause. As such, the Court finds that Plaintiff did indeed engage in protected activity under Section 704(a)'s participation clause.

Plaintiff next must prove that he suffered an adverse employment action. As evidence of this, Plaintiff asserts that his shift changed and that he was allegedly demoted from

Alternant Supervisor to Patrolman. The Defendants appear to concede that such actions constitute an adverse employment action.

To meet the third prong of a prima facie case of retaliation, Plaintiff must prove that a causal link exists between the protected activity and the adverse employment action. In this case, Plaintiff attempts to prove such a causal link by showing proximity in time between Plaintiff's protected activity and the adverse employment action(s). As the Fifth Circuit has explained, the causation element of a plaintiff's prima facie case may be proved by temporal proximity between the protected activity and the adverse employment action when they occur "very close" in time. Washburn v. Harvey, 504 F.3d 505, 511 (5th Cir. 2007); see also Clark Cnty School Dist. V. Breeden, 532 U.S. 268, 273, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001) (noting that "cases that accept mere temporal proximity . . . as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close").

Here, Plaintiff was questioned on two separate occasions concerning whether he would testify in his former co-workers employment discrimination lawsuit. Plaintiff responded, apparently on both occasions, that he would "tell the truth" if subpoenaed. While Plaintiff's statements in December 2007 do not satisfy the causal connection requirement, as Plaintiff's shift change did not occur until November 2009, Plaintiff's statement in August 2009 does suffice to show a causal link. See, e.g., Evans v. City of Houston, 246 F.3d 344, 355 (5th Cir. 2001) (finding that "a time lapse of up to four months has been found sufficient to satisfy the causal connection for summary judgment purposes") (internal citations omitted); see also Weeks v. NationsBank, N.A., 2000 WL 341257, at *3 (N.D. Tex. Mar. 30, 2000)

(citing <u>Garrett v. Constar Inc.</u>, 1999 WL 354239, at *5 (N.D. Tex. May 25, 1999)); <u>Stroud v. BMC Software, Inc.</u>, 2008 WL 2325639 (5th Cir. June 6, 2008) (finding that a three-week lapse between protected activity and adverse employment action was sufficient to show a causal link); <u>Richard v. Cingular Wireless LLC</u>, 233 F. App'x 334, 338 (5th Cir. 2007) (concluding that two-and-one-half months is short enough to support an inference of a causal link). Given this, the Court will assume that the temporal proximity between Plaintiff's August 2009 statement and his November 2009 shift change can alone establish a prima facie case of retaliation.

### (ii)     Legitimate, Non-Retaliatory Reason

Once a plaintiff establishes a prima facie case of retaliation, the defendant must then articulate a legitimate, non-retaliatory reason for its employment action. Here, Defendants asserts that Plaintiff's shift was changed in order to accommodate veteran officers. Further, Defendants asserts that every employee working at the MVSU Police Department also endured a shift change. This articulated reason satisfies Defendants' burden of production.

### (iii)     Pretext / Mixed Motive

Unlike the third element of a prima facie retaliation claim, when a plaintiff attempts to prove pretext, the plaintiff must prove that "the adverse employment action taken against [her] would not have occurred '*but for*' h[is] protected conduct." <u>Septimus v. Univ. of Houston</u>, 399 F.3d 601, 608 (5th Cir. 2005) (emphasis added).  The plaintiff may not rely only on close temporal proximity to meet this but-for pretext test. <u>See</u> <u>Strong</u>, 482 F.3d at 808 (finding that "temporal proximity alone is insufficient to prove but for causation . . . [because] [s]uch a rule would unnecessarily tie the hands of employers.").  However, as discussed

above, the Fifth Circuit recently found that the mixed-motive analysis is also applicable to retaliation claims. See Smith, 602 F.3d at 332; Davis v. Farmers Ins. Exch., 2010 U.S. App. LEXIS 7130, at *5 (5th Cir. Apr. 6, 2010).

In this case, Plaintiff has presented sufficient factual disputes to withstand summary judgment. Plaintiff contends that his shift changed to the evening shift and that he was demoted from Alternative Supervisor to Patrolman only three months after informing his supervisors of his willingness to testify in his former co-worker's employment discrimination lawsuit. While Defendants fail to actually conduct any type of pretext and/or mixed-motive analysis in their summary judgment motion, they do make an argument that all employees at the MVSU Police Department allegedly also encountered this shift change. However, Plaintiff asserts that his shift change occurred on November 9, 2009, and that other individuals working at the MVSU Police Department did not endure a shift change until December 14, 2009. Further, in Plaintiff's affidavit and in his responses to interrogatories -- which are both part of the summary judgment record -- Plaintiff asserts several other facts that support his retaliation claim. First, Plaintiff contends that not every individual working at the police department continued to endure a shift change. Plaintiff asserts that he filed a grievance with MVSU on the same day as his co-worker, Louis Baymon, and that Baymon received his original position back, but Plaintiff did not. Second, Plaintiff contends that Sanders told him that he was not going to allow Plaintiff to "build a case against him." Third, Plaintiff asserts that, after he informed his supervisors of his willingness to testify, his vehicle inspection sheets and daily performance logs started coming up missing. The Defendants do not address any of these allegations.

Defendants do, however, contend that Sanders and Morris intended to give Plaintiff his original position back. Plaintiff followed the appropriate grievance process and procedure at MVSU after his shift was changed and he was allegedly demoted. After attending a meeting with Sanders and Morris, Morris authored a letter addressed to Plaintiff conceding that Plaintiff had made valid arguments concerning his shift change. Morris stated that that Plaintiff would receive his original position back effective January 18, 2010. However, Plaintiff did not receive this letter until January 21, 2010. Defendants appear to assert that because Sanders and Morris conceded that Plaintiff had valid grievances, they should be entitled to summary judgment. Yet, the Plaintiff was never actually given his original position back, and his grievances were never actually redressed. In fact, after receiving the letter from Morris, Plaintiff attempted to show up to work for his old position, and he was immediately sent home. In response to this, Defendants argue that Plaintiff would have eventually received his position back, but he resigned before that could happen. The problem with this argument, however, is that in order for the Court to accept such an assertion, the Court would have to engage in not only speculation, but also fact-finding. That is, the Court would have to accept Defendants' assertions and merely assume that, had the Plaintiff continued working at MVSU, he would have sometime in the future received his prior job back. At the summary judgment stage, the Court may not make credibility determinations, engage in fact-finding concerning muddled and disputed factual allegations, or simply take the word of the Defendants to the exclusion of the Plaintiff. See Williams v. City of Tupelo, Mississippi, 414 F. App'x 689, 695 (5th Cir. 2011). Given this, the evidence as a whole

creates a factual dispute as to whether Plaintiff can prove a claim of retaliation under Title VII. Thus, Defendants' Motion for Summary Judgment as to this action is denied.

*Harassment / Hostile Work Environment*

To set forth a prima facie case of discrimination alleging hostile work environment, the plaintiff must establish five elements: (1) the employee belongs to a protected group; (2) the employee was subject to unwelcomed harassment; (3) the harassment complained of was based on the protected class or group; (4) the harassment complained of was so severe or pervasive that it affected the terms, conditions, or privileges of employment; and (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action (i.e., vicarious liability). Jones v. Flagship Intern., 193 F.2d 714, 719–20 (5th Cir. 1986); Celestine v. Petroleos de Venezuella, SA, 266 F.3d 343, 353 (5th Cir. 2001) (citing Watts v. Kroger Co., 170 F.3d 505, 509–10 (5th Cir. 1999)).

While Plaintiff asserted a hostile work environment claim in his Complaint, he failed to adequately brief such a claim in his response to Defendant's summary judgment motion. That is, Plaintiff only briefly mentions harassment and/or hostile work environment in his summary judgment brief, and that is only in relation to his constructive discharge claim. In fact, Plaintiff never even discusses his protected class and never asserts that such alleged harassment stemmed from being a member of this class. As such, Plaintiff has failed to present a material dispute to support his hostile work environment claim, and Defendants are entitled to summary judgment as to this action.

*Constructive Discharge*

"A constructive discharge occurs when the employer makes working conditions so intolerable that a reasonable employee would feel compelled to resign." Hunt v. Rapides Healthcare Sys., LLC, 277 F.3d 757, 771 (5th Cir. 2001). In examining a claim of constructive discharge, the court objectively considers a variety of factors, including the following:

    (1)    demotion;

    (2)    reduction in salary;

    (3)    reduction in job responsibilities;

    (4)    reassignment to menial or degrading work;

    (5)    badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or

    (6)    offers of early retirement that would make the employee worse off whether the offer was accepted or not.

Id. at 771-72 (citing Barrow v. New Orleans S.S. Ass'n, 10 F.3d 292, 297 (5th Cir. 1994)). Further, the Fifth Circuit has held that "constructive discharge cannot be based upon the employee's subjective preference for one position over another. Id. at 772 (citing Jurgens v. EEOC, 903 F.2d 386, 391 (5th Cir. 1990)). The inquiry does not focus on whether the employee "felt compelled to resign, but whether a reasonable employee in her situation would have felt so compelled." Id. The Fifth Circuit has looked to whether the employee attempted resolution of her concerns before choosing to resign in determining whether certain working conditions would have compelled a reasonable employee to resign. Haley v. Alliance Compressor Co., 391 F.3d 644, 652 (5th Cir. 2004).

Here, Plaintiff asserts that he was demoted from Alternate Supervisor to Patrolman, that he suffered a shift change, and that these actions forced him to resign. Defendants do not deny such assertions; however, Defendants contend that Plaintiff cannot prove a constructive discharge claim because Sanders and Morris agreed that Plaintiff raised valid points in the filing of his grievances. Defendants assert that Plaintiff would have received his original job back had he not resigned. As noted above, this assertion is grounded in conjecture. When Plaintiff returned to work at his previous shift time, he was instantly dismissed. Accordingly, given that Plaintiff suffered a demotion and a shift change and that Plaintiff made multiple efforts to resolve the situation prior to resigning, material facts exists as to whether Plaintiff can prove claim for constructive discharge. Defendants' summary judgment motion as to this action is, therefore, denied.

*First Amendment Retaliation*

Plaintiff next asserts, under 42 U.S.C. Section 1983, that Defendants Morris and Sanders violated his rights under the First Amendment of the United States Constitution. A plaintiff can establish a prima facie case under Section 1983 by alleging: (1) a violation of a federal constitutional or statutory right – in this case, the First Amendment; and (2) that the violation was committed by an individual acting under the color of state law. Doe v. Rains County Indep. Sch. Dist., 66 F.3d 1402, 1406 (5th Cir.1995). The statute creates no substantive right, but only provides remedies for deprivations of rights created under federal law. Graham v. Connor, 490 U.S. 386, 393-94, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). However, as discussed in detail above, officials sued under Section 1983 in their personal capacities may be able to assert a qualified immunity defense. Before turning to the second-

prong of the qualified immunity analysis (i.e., whether the Defendants acted "objectively reasonable"), the Court first analyzes whether Plaintiff has shown a violation of a clearly established First Amendment right.

The First Amendment provides protection against retaliation for engaging in protected speech in the course of employment under certain circumstances. To establish a Section 1983 claim for employment retaliation related to speech, a plaintiff-employee must show: (1) he suffered "an adverse employment action," see Alexander v. Eeds, 392 F.3d 138, 142 (5th Cir. 2004); (2) he spoke "as a citizen on a matter of public concern," see Garcetti v. Ceballos, 547 U.S. 410, 126 S. Ct. 1951, 1958, 164 L. Ed. 2d 689 (2006); (3) his interest in the speech outweighs the government's interest in the efficient provision of public services, see Pickering v. Bd. of Educ., 391 U.S. 563, 568, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968); and (4) the speech "precipitated the adverse employment action," see Eeds, 392 F.3d at 142.

Whether an employee's speech addresses a matter of public concern turns on whether the affected individual speaks "primarily as a citizen rather than as an employee." Dorsett v. Bd. of Trustees State Colleges & Universities, 940 F.2d 121, 124 (5th Cir. 1991). Additionally, "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement." Communications Workers of America v. Ector County Hosp. Dist., 467 F.3d 427, 437 (5th Cir. 2006) (quoting Connick v. Meyers, 461 U.S. 138, 146, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983)). Under Garcetti, for an employee's speech to qualify for First Amendment protection, he must be speaking "as a citizen on a matter of public concern." 547 U.S. at 418, 126 S. Ct. 1951(emphasis added). An employee is not speaking as a citizen-but rather in his role as an employee-when he "make[s]

statements pursuant to [his] official duties." <u>Id.</u> at 421-22, 126 S. Ct. 1951 ("Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen.").

While there are multiple tests to determine whether speech is of public concern, the Fifth Circuit generally employs the "content-form-context test" (also known as the "<u>Connick</u> test"). Under this test, "whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole court record." <u>Connick</u>, 461 U.S. at 147-48, 103 S. Ct. 1684. Here, the basis for Plaintiff's First Amendment claim is not entirely clear. That is, Plaintiff entirely failed to identify the precise speech in which he claims was protected and addressed a matter of public concern. In fact, Plaintiff only briefly recites First Amendment law generally and then blanketly alleges that his speech falls within the sphere of protection afforded by such law. However, as the Fifth Circuit noted in <u>Foley v. University of Houston System</u>, 355 F.3d 333, 342 (5th Cir. 2003), without a "precise identification of the speech as to which First Amendment protection is claimed," the Court is unable to analyze or even consider the speech's "content, context, and form as required by the Supreme Court."

Since Plaintiff was not subpoenaed and never actually testified in his former co-worker's trial, his free speech claim presumably involves the single statement made directly to Sanders that Plaintiff would "tell the truth" if called to testify. Thus, the only statement (i.e., the only "speech") Plaintiff ever actually made was directly to his supervisor, apparently in a one-on-one conversation, in direct response from a question posed during the course of his employment. Plaintiff presents no other evidence concerning this statement, and there is

no proof anywhere in the record that he was speaking to Sanders as a "citizen" on a matter of public concern, rather than as an "employee" answering a question from a supervisor. Accordingly, because Plaintiff (1) failed to identify the precise "speech" that he claims ignites First Amendment protection; and (2) failed to produce evidence that he was speaking on a matter of public concern, the Defendant's summary judgment motion is granted as to this claim.[16]

*Equal Protection Claim*

Plaintiff next claims a violation of the Equal Protection Clause of the Fourteenth Amendment. "To state a claim under the Equal Protection Clause, a Section 1983 plaintiff must allege that a state actor intentionally discrimination against the plaintiff because of membership in a protected class." Sir Williams v. Bramer, 180 F.3d 699, 705 (5th Cir. 1999). As discussed above concerning Plaintiff's Title VII discrimination claim, Plaintiff has failed to allege any type of "class-based" discrimination. That is, Plaintiff never once even mentions his protected class. Thus, Plaintiff is apparently alleging a "class-of-one" equal protection claim. However, such class-of-one equal protection claims are not cognizable in the public employment context. Engquist v. Or. Dep't of Agric., 553 U.S. 591, 608-09, 128 S. Ct. 2146, 170 L. Ed. 2d 975 (2008); Porter v. Valdez, 2011 WL 1810607, at *6 (5th Cir. May 11, 2011). Thus, because Plaintiff has failed to demonstrate a claim under the Equal Protection Clause, the Court need not address the second prong (objective reasonableness) of the Section 1983

---

[16] See Price v. Roark, 256 F.3d 364, 369 (5th Cir. 2001) ("[i]f the allegations do not establish the violation of a constitutional right, the officer is entitled to qualified immunity.").

qualified-immunity analysis.[17]  Hence, Defendants' Motion for Summary Judgment is granted as to this claim.

*Punitive Damages*

Plaintiff also makes a claim for punitive damages.  A plaintiff who prevails on his Title VII claim may recover punitive damages if he makes the required showing.  Following the Supreme Court's decision in <u>Kolstad v. Am. Dental Ass'n</u>, 527 U.S. 526, 119 S. Ct. 2118, 144 L. Ed. 2d 494 (1999), the Fifth Circuit has set forth the standard to be applied when an employer is alleged to be liable for punitive damages based on the actions of a managerial employee:

> A plaintiff may recover punitive damages if the defendant acted "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). The availability of punitive damages turns on the defendant's state of mind, not the nature of the defendant's egregious conduct. <u>Kolstad</u>[ ], 527 U.S. [at 535, 119 S. Ct. 2118].   The employer "must at least discriminate in the face of a perceived risk that its actions will violate" the [discrimination statute]. <u>Id.</u> at 536 . . . Moreover, the plaintiff must show that the "malfeasing agent served in a 'managerial capacity' and committed the wrong while 'acting in the scope of employment.' "<u>Rubinstein v. Adm'rs of the Tulane Educ. Fund</u>, 218 F.3d 392, 405 (5th Cir. 2000) (citing <u>Kolstad</u>, 527 U.S. at 541). However, under the good-faith exception, "an employer may not be vicariously liable for the discriminatory employment decision of managerial agents where these decisions are contrary to the employer's good-faith efforts to comply with Title VII." <u>Id.</u> (citing <u>Kolstad</u>, 527 U.S. at 545) (internal quotation marks omitted).

<u>E.E.O.C. v. E.I. Du Pont de Nemours & Co.</u>, 480 F.3d 724, 732 (5th Cir. 2007).

---

[17] <u>See</u> <u>Brown v. Callahan</u>, 623 F.3d 249, 253 (5th Cir. 2010) ("A court may rely on either prong of the [qualified immunity] defense in its analysis.").

While Defendants have presumably moved for summary judgment concerning all of Plaintiff's claims, Defendants never actually address Plaintiff's claim for punitive damages. Due to this, and because the presentation of proof at trial will allow for a more informed decision, Defendants' motion (if made) is, at this point, denied.

## IV. CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment is granted in part and denied in part. Defendants' Motion is granted with respect to Plaintiff's claims for discrimination, hostile work environment, First Amendment retaliation, and discrimination under the Equal Protection Clause. Defendants' Motion is denied as to Plaintiff's claims for Title VII retaliation, constructive discharge, and punitive damages.

So ordered on this, the __10th__ day of August, 2011.


**/s/   Sharion Aycock_____**
**UNITED STATES DISTRICT JUDGE**